# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **TORRIE ADCOCK,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:09cv00003 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | BY: GLEN M. WILLIAMS |
| **Commissioner of Social Security,** | ) | SENIOR UNITED STATES DISTRICT JUDGE |
| Defendant. | ) | |

In this social security case, I vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, Torrie Adcock, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claims for supplemental security income, ("SSI"), and disability insurance benefits, ("DIB"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2003 & Supp. 2009). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517

Case 2:09-cv-00003-GMW-PMS   Document 14   Filed 10/14/09   Page 1 of 37   Pageid#: 63

(4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Adcock protectively filed her applications for DIB and SSI on July 14, 2004, alleging disability as of June 30, 2000, (Record, ("R."), at 61-65, 466-68), due to problems such as multiple schlerosis, fatigue, weakness, various pains, shortness of breath, swollen fingers and feet, memory problems, restlessness, insomnia, joint pain, depression, numbness of limbs and muscle spasms. (R. at 124, 170.) The claims were denied initially and upon reconsideration. (R. at 45-51, 469-74.) Adcock then requested a hearing before an administrative law judge, ("ALJ"). (R. at 52.) A hearing was held on January 22, 2007, at which Adcock testified and was represented by counsel. (R. at 482-516.)

By decision dated February 5, 2007, the ALJ denied Adcock's claims. (R. at 19-31.) The ALJ found that Adcock met the insured status requirements of the Act for DIB purposes through September 30, 2007. (R. at 21.) The ALJ also found that Adcock had not engaged in substantial gainful activity since June 30, 2004, the alleged onset date of disability. (R. at 21.) The ALJ determined that the medical evidence established that Adcock suffered from severe impairments, namely multiple sclerosis, fibromyalgia, obstructive sleep apnea and a mental disorder. (R. at 23-24.)

-2-

However, he found that Adcock did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) After consideration of the medical evidence, the ALJ determined that Adcock retained the residual functional capacity to perform a wide range of work at the sedentary[1] level of exertion, noting that although Adcock would be required to work in a low stress environment, she nonetheless had the mental capacity and adequate attention/concentration to understand and carry out routine work tasks, to relate to others on an intermittent basis and to adapt to infrequent changes in schedules and routines. (R. at 26.) In addition, the ALJ found that Adcock could frequently lift and/or carry items weighing up to 10 pounds, stand/walk for at least two hours in an eight-hour workday and sit for approximately six hours in an eight-hour workday. (R. at 26.) The ALJ determined that Adcock could occasionally climb, balance, stoop, kneel, crouch and crawl, noting no other significant manipulative, visual, communicative or environmental limitations. (R. at 26.) Based upon these findings, the ALJ found that Adcock was unable to perform any of her past relevant work. (R. at 29.) Transferability of job skills was found to be non-material to the determination of disability because, according to the ALJ, using the Medical-Vocational Rules as a framework supported a finding of "not disabled" whether or not Adcock possessed transferable skills. (R. at 29.) Based upon Adcock's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, including occupations such as a cashier, a receptionist and a general clerk. (R. at 30.) Thus, the

---

[1]Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers and small tools. *See* 20 C.F.R. §§ 404.1567(a), 416.967(a) (2009).

ALJ concluded that Kersey was not under a disability as defined in the Act and was not entitled to benefits. (R. at 30-31.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2009).

After the ALJ issued his decision, Adcock pursued her administrative appeals and sought review of the ALJ's decision, (R. at 13-15), however, the Appeals Council denied her request for review. (R. at 6-9.) Adcock then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2009). This case is now before the court on Adcock's motion for summary judgment, which was filed June 10, 2009, and on the Commissioner's motion for summary judgment, which was filed July 13, 2009.

## II. Facts

Adcock was born in 1974, (R. at 61, 159), which classifies her as a "younger person" under §§ 404.1563(c), 416.963(c). According to the record Adcock earned her general equivalency development diploma, ("GED"), and has past relevant work experience as a supermarket cashier/stocker and as a factory worker. (R. at 29, 88, 93.)

At the hearing before the ALJ on January 22, 2007, Adcock testified that, due to a pituitary tumor, she gained a significant amount of weight. (R. at 488-89.) Adcock also testified that her job as a cashier required her to wait on customers and stock cigarettes. (R. at 491.) She explained that the job was not heavy labor, stating

-4-

that she could sit or stand as needed.  (R. at 491.)  She further explained that her past jobs did not require heavy lifting, noting that she mainly stood, scanned products and placed them into a grocery bag.  (R. at 492.)

Adcock described a varied sleep pattern, claiming that she tried to go to bed around 10:00 p.m., but that she sometimes did not go to sleep until 3:00 or 4:00 a.m. (R. at 493.)  She indicated that she normally slept until approximately 1:00 p.m. each day and explained that her nights were usually restless.  (R. at 493.)  Adcock testified that she did not get much sleep, noting that she was up and down throughout a typical night, specifically stating that, due to excessive sweating, she frequently awakened to cool herself down.  (R. at 493.)  Adcock further testified that after awaking and using the restroom, she would return to bed to watch television for approximately three hours.  (R. at 494.)  She later estimated that she probably slept two to three hours per night.  (R. at 505.)  Adcock stated that she did not cook meals, perform housework and noted that she bathed only once every four days.  (R. at 494-95.)  She explained that she bathed infrequently because of lack of energy.  (R. at 494.)  She testified that she did not get out much, but acknowledged that she typically shopped for groceries when she received her food stamps each month.  (R. at 495.)  However, she stated that she was unable to walk when shopping and explained that she used a wheelchair shopping cart.  (R. at 495.)

Adcock explained that she experienced pain "everywhere" and described the pain as throbbing and constant from her head to her toes.  (R. at 495.)  She commented that she was unable to treat her pain with medication due to lack of insurance and inability to pay for the medication.  (R. at 495.)  She testified that she previously

-5-

treated her pain with medications such as Percocet, Lortab and Soma. (R. at 496.) She further testified that although the medications minimized her pain when she was taking them, her pain was never under control. (R. at 496.) Adcock indicated that even with the benefit of pain medication, her pain rated as an eight on a 10-point scale. (R. at 496.) She rated her pain as a five or six at the hearing, acknowledging that sitting alleviated her pain to a certain extent. (R. at 496-97.) Adcock explained that walking around "kill[ed her]" and noted that sitting was painful, but that she had learned to tolerate it. (R. at 497.)

Adcock testified that she suffered from medical problems such as diabetes, fibromyalgia and a condition relating to her pituitary gland, but explained that she was not taking medication for any of the problems due to her lack of insurance and financial situation. (R. at 497-98.) Even without medication, Adcock stated that her blood sugar levels were not "too hateful" considering the lack of treatment. (R. at 497.) She acknowledged that her doctors had advised her that exercise was the best treatment for fibromyalgia; however, she stated that despite attempts, she was unable to exercise due to the pain. (R. at 498.) Adcock also referenced certain mental health problems such as depression, sadness, crying spells, anxiety and panic attacks. (R. at 499.) She stated that her crying spells typically lasted five to 10 minutes at a time, explaining that such spells "come and go." (R. at 499.) Adcock testified that she used to drink alcohol, but stated that she quit drinking around the time she was diagnosed with multiple sclerosis. (R. at 499.)

Adcock also testified that she experienced a migraine headache at least every other day, and she compared the pain to a hangover, stating that it was a pounding-

-6-

type pain. (R. at 499-500.) She then noted that she had not actually been diagnosed with migraines, explaining that she simply assumed that the headaches were migraines due to the severity. (R. at 500.) In fact, Adcock commented that the headaches were so severe that she was forced to crawl into her bed, close the curtains and lie in bed, noting that there was nothing else she could do to relieve them. (R. at 500.) She explained that she had been prescribed Topamax to treat her headaches, but said that she was out of her samples. (R. at 501.) She acknowledged that Topamax helped her headaches, indicating that once she was off the medication and out of samples, her headaches resurfaced. (R. at 501.)

Adcock testified that, at the time of the hearing, she was not taking medication to treat her multiple sclerosis. (R. at 501.) Once again, she stated that she was unable to treat her condition because she had no insurance and could not afford the medication. (R. at 501.) She commented that multiple sclerosis caused her to frequently fall and run into things, and she explained that she also experienced symptoms such as pain, fatigue and lack of energy. (R. at 502.) In addition, Adcock testified that, due to pain and shortness of breath, she was no longer able to participate in activities such as riding a bicycle. (R. at 502.) Adcock noted that, since being sick, she had been involved in a couple of car accidents, causing her to fear driving. (R. at 503.) Thus, Adcock indicated that she quit driving. (R. at 503-04.) Adcock also testified that her two children did not live with her and that she no longer had custody of either child. (R. at 503.) She added that it was probably best that her children lived elsewhere, claiming that she was unable to care for them. (R. at 503.)

Adcock testified that she had received mental health treatment to address

-7-

problems such as depression, anxiety and panic attacks. (R. at 505.) She explained that she felt crazy and experienced constant sadness, noting that she did not want to get up each moring. (R. at 505-06.) Adcock also stated that she experienced depression and crying spells due to the situation with her husband. (R. at 506.) She further testified that she was "always down" and "never happy," acknowledging that she needed help. (R. at 506.) Adcock then opined that her multiple sclerosis was getting worse because she was falling more frequently and losing eyesight. (R. at 506-07.)

Sandra Wells-Brown, a vocational expert, also testified at the hearing. (R. at 510-15.) Wells-Brown classified Adcock's past relevant work as a cashier as semi-skilled and light.[2] (R. at 511.) Wells-Brown noted that Adcock's work as a convenient store cashier required no lifting and allowed for a sit/stand option, which she opined was not typical for a convenience store cashier because such jobs normally require stocking. (R. at 511.) She explained that such a job normally would be classified as medium work.[3] (R. at 511.) The ALJ then asked Wells-Brown to consider a hypothetical individual of the same age and education as Adcock, who was confined to sedentary work. (R. at 511.) The ALJ also asked Wells-Brown to

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If an individual can perform light work, she also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2009).

[3]Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If an individual can perform medium work, she also can perform light and sedentary work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2009).

consider the limitations set forth in Exhibit 29F[4] and to consider that the hypothetical claimant suffered from pain that was noticeable to her at all times, i.e. in the moderate range, and could be attentive to and carry out assigned duties despite the above-mentioned limitations. (R. at 512-13.) Based upon this particular hypothetical, Wells-Brown opined that such an individual would be unable to perform Adcock's past relevant work. (R. at 513.)

However, Wells-Brown noted that, even considering the previously mentioned limitations, there were jobs existing in the national economy that such an individual would be able to perform, such as a cashier at the semi-skilled sedentary level. (R. at 514.) She also indicated that Adcock possessed transferable skills from her past work as a cashier. (R. at 514.) Wells-Brown further explained that there were additional jobs existing in the national economy that such an individual could perform, including the unskilled, sedentary positions of a receptionist and general clerk. (R. at 515.) She stated that her testimony was consistent with the Dictionary of Occupational Titles. (R. at 515.) The ALJ then asked Wells-Brown to consider a second hypothetical, in which the individual would be required to spend the majority of the workday in bed. (R. at 515.) Wells-Brown testified that an individual with such a limitation would be precluded from any competitive employment. (R. at 515.)

In rendering his decision, the ALJ reviewed medical evidence from Pathologist, Inc.; Memorial Hospital; Providence Hospital; Dr. Souheil Al-Jadda, M.D.; Erie County Family Planning and Adolescent Health Program; Firelands Community

---

[4]Exhibit 29F is a Mental Residual Functional Capacity Assessment, which was completed by Roger O. Lewis, Ph.D., a state agency psychologist, on September 24, 2004. (R. at 380-82.)

-9-

Hospital; Sara M. Derrick, Ph.D.; Patricia S. Semmelman, Ph.D., a state agency psychologist; Darlene J. Barnes, Ph.D.; Dr. Michael W. Lindamood, M.D.; Vicki Casterline, Ph.D., a state agency psychologist; Midwest Pain Treatment Center; Blanchard Valley Sleep Disorders Center; Dr. A.K. Bahaiji, M.D.; Lima Memorial Hospital; Dr. Kurt A. Kuhlman, D.O.; The Cleveland Clinic; Dr. Myron Shank, M.D., Ph.D.; a state agency physician; Roger O. Lewis, Ph.D., a state agency psychologist; Mel M. Zwissler, Ph.D., a state agency psychologist; and Dr. Augusto Pangalangan, M.D., a state agency physician. Following the hearing, Adcock's counsel also submitted medical records from Piedmont Community Services to the Appeals Council.[5]

The court notes that the record contains medical evidence from the time period prior to June 30, 2000, Adcock's alleged onset of disability date. Any reference to such evidence is included only for clarity of the record. For the purposes of this opinion, the summarization of facts will focus upon the time period subsequent to June 30, 2000.

On December 22, 2000, Adcock underwent a consultative physical examination performed by Dr. Michael W. Lindamood, M.D. (R. at 286-92.) Adcock reported that she was unable to work due to back pain, which she attributed to an August 2000 accident in which she was hit by a car. (R. at 286.) She explained that she experienced intermittent sharp spasms in her upper and lower back. (R. at 286.)

---

[5]Since the Appeals Council considered this evidence in reaching its decision not to grant review, this court also should consider this evidence in determining whether substantial evidence supports the ALJ's findings. *See Wilkins v. Sec'y of Dept. of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).

Adcock also reported stiffness, but stated that it seemed to improve with activity. (R. at 286.) She also stated that her symptoms were aggravated by extended standing and sitting. (R. at 286.) Adcock noted that her pain caused restlessness at night. (R. at 286.)

Upon examination, Dr. Lindamood observed diffuse muscle tenderness to even minimal palpation, particularly over the lumbosacral, parascapular and trapezius muscle groups. (R. at 286.) He noted that there were palpable trigger/tender points, and he explained that Adcock's back range of motion showed 45 degrees of flexion, 20 degrees of extension and 20 degrees of right and lateral bending. (R. at 286.) Dr. Lindamood reported that Adcock's station and gait were unremarkable, and he noted that she did not limp or need the aid of an ambulatory device. (R. at 286.) Adcock had no difficulties raising up and down from a chair or the examination table. (R. at 286.) Dr. Lindamood also indicated that straight leg raising maneuvers were negative in a sitting and supine position. (R. at 286.) An examination of the lower extremities revealed normal motion without symptoms in both hips. (R. at 287.) Adcock's knees were stable and she exhibited a normal range of motion. (R. at 287.) Examinations of the ankles and feet were unremarkable, her pedal pulses were two plus and equal bilaterally, there were no trophic changes of chronic venous or arterial insufficiency and there was no peripheral edema. (R. at 287.)

A neurologic evaluation of the lower extremities showed deep tendon reflexes, both knee jerks and ankle jerks, to be one to two plus and equal bilaterally. (R. at 287.) No abnormalities were noted. (R. at 287.) An examination of the upper extremities revealed normal motion in both shoulders. (R. at 287.) Adcock did report

-11-

trapezius muscle group discomfort during shoulder motion testing, but, overall, she had good shoulder stability. (R. at 287.) All other findings were normal. (R. at 287.) A neurologic evaluation of the upper extremities indicated that deep tendon reflexes were one to two plus and equal bilaterally. (R. at 287.) A neck examination revealed normal motion, but Adcock did note complaints of trapezius muscle group discomfort at the extremes of neck rotation. (R. at 287.) Dr. Lindamood noted that there were palpable trigger/tender points of the trapezius and parascapular muscle groups. (R. at 287.)

Dr. Lindamood ordered x-rays of the lumbar spine, which yielded unremarkable findings. (R. at 287-88.) Dr. Lindamood opined that, based upon objective data alone and from a musculoskeletal standpoint, he could not make specific recommendations concerning Adcock's work-related activities. (R. at 287.) He noted that Adcock had limited her activity level secondary to chronic soft tissue back pain. (R. at 287.) Dr. Lindamood's clinical impression noted fibromyalgia, resulting from the August 2000 accident, and concluded that there was no subjective or objective evidence of lumbar radiculopathy. (R. at 287.)

Shortly thereafter, on December 27, 2000, Adcock presented to Darlene J. Barnes, Ph.D., for a consultative psychological examination. (R. at 279-85.) At the time of the evaluation, Adcock was working on a part-time basis as a cashier. (R. at 284.) She informed Barnes that she was applying for disability benefits due to physical and mental problems, including back and neck problems, chronic pain and depression. (R. at 284.) Adcock indicated that her back problems were the result of being hit by a car when she was crossing the road in August 2000. (R. at 279.)

-12-

Adcock reported a longstanding history of alcohol abuse, noting that she started drinking alcohol at age 16, after being raped. (R. at 282.) She communicated that she continued to abuse alcohol following the alleged rape, but indicated that, at the time of the evaluation, she had nearly quit drinking, stating that she drank only one beer per week. (R. at 282.) Adcock also reported a longstanding history of physical and emotional abuse, noting that a past boyfriend stabbed her. (R. at 280-81.) She explained that, as a result of the stabbing, she has suffered from nightmares and flashbacks. (R. at 280.)

Barnes found that Adcock exhibited mild impairment in her capacity for understanding and remembering information, such as locations, work-like procedures, short and simple instructions and detailed instructions. (R. at 284.) In addition, it was determined that Adcock was able to maintain attention for three to four hours, but it was noted that she was distracted at times due to anxiety and depression. (R. at 284.) Barnes found that Adcock could perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, sustain an ordinary routine without special supervision and work in coordination or proximity to others without being distracted. (R. at 284.) Barnes noted that Adcock could make simple work-related decisions, but a moderate impairment was found in her ability to maintain focus. (R. at 284.) Barnes further explained that Adcock was able to complete a normal workday and workweek without interruptions on a part-time basis. (R. at 284.) However, Barnes found that Adcock suffered from anxiousness, depression and alcohol problems, opining that she remained at risk for potential decompensation under stress. (R. at 284-85.) Barnes found Adock to be moderately limited in these areas. (R. at 285.)

-13-

Barnes further found that Adcock was able to interact appropriately with the general public, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors. (R. at 285.) In addition, Barnes noted that Adcock was able to get along well with co-workers/peers without exhibiting behavioral extremes, and she was able to maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. (R. at 285.) Thus, Barnes concluded that Adcock exhibited only mild impairments in the above-mentioned areas of social interaction. (R. at 285.) As to Adcock's adaptation skills, Barnes determined that Adcock was prone to deterioration under extremes of stress, which would cause her to become more depressed, anxious and possibly begin to abuse alcohol again. (R. at 285.) Barnes found that, at times, Adcock experienced difficulties responding appropriately to changes in the work setting, determining that she was not able to set realistic goals or make plans independently of others. (R. at 285.) Barnes also opined that Adcock remained dependent on males for directions and guidance. (R. at 285.) As such, Barnes found that she was markedly impaired in her adaptation skills. (R. at 285.) Barnes further noted that, if benefits were to be awarded to Adcock, an assigned trustee should be utilized to manage her funds due to Adcock's longstanding history of alcohol abuse. (R. at 285.)

Barnes's diagnostic impression indicated that Adcock suffered from clinical disorders and other conditions, including post-traumatic stress disorder, chronic with delayed onset, dysthymic disorder, early onset, alcohol abuse and a parent-child relational problem. (R. at 284.) Barnes also determined that Adcock suffered from a personality disorder, not otherwise specified, borderline and anti-social personality traits, health problems such as middle back pain, neck pain and stomach pain, chronic

-14-

relationship problems, unresolved trauma and poverty.  (R. at 284.)  Barnes reported that Adcock had a past and then-current Global Assessment of Functioning, ("GAF"), score of 55.[6]  (R. at 284.)

Vicki Casterline, Ph.D, a state agency psychologist, completed a Psychiatric Review Technique form, ("PRTF"), on January 18, 2001, which revealed evidence of an affective disorder, anxiety-related disorder, personality disorder and substance addiction disorder.  (R. at 294-306.)  Casterline found that Adcock suffered from dysthymia and a personality disorder, not otherwise specified, but noted that neither disorder precisely satisfied the diagnostic criteria.  (R. at 297, 301.)  As to Adcock's symptoms of an anxiety-related disorder, it was determined that she experienced recurrent and intrusive recollections of a traumatic experience, which were a source of marked distress.  (R. at 299.)  Casterline also found that Adcock suffered from symptoms of a substance abuse disorder, noting that she experienced behavioral changes or physical changes associated with the regular use of substances that affect the central nervous system.  (R. at 302.)  Casterline indicated that Adcock was mildly limited in her activities of daily living and in her ability to maintain social functioning.  (R. at 304.)  Adcock was found to be moderately limited in her ability to maintain concentration, persistence or pace.  (R. at 304.)  No episodes of decompensation were noted.  (R. at 304.)

---

[6]The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness."  DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994).  A GAF score of 51-60 indicates "[m]oderate symptoms . . .  OR moderate difficulty in social, occupational, or school functioning."  DSM-IV at 32.

-15-

Casterline also completed a Mental Residual Functional Capacity Assessment, ("MRFC"), on January 18, 2001, finding Adcock to be moderately limited in her ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (R. at 307-09.) Casterline found that Adcock was not significantly limited in all other areas that were assessed. (R. Aat 307-09.)

Adcock was treated at Lima Memorial Hospital several times between July 8, 2004, and October 21, 2004. (R. at 329-43.) On July 8, 2004, x-rays of the feet were taken. (R. at 343.) An x-ray of the right foot revealed normal findings, and an x-ray of the left foot showed a completely healed osteotomy in the distal aspect of the first metatarsal with a K-wire. (R. at 343.) The left foot x-ray showed no bony erosions or radiolucency developed around the K-wire. (R. at 343.) On July 27, 2004, Adcock presented for a bone density study, which revealed normal bone density at all measured sites. (R. at 339-40.)

Adcock was treated by Dr. Kurt A. Kuhlman, D.O., from October 5, 2004, to December 7, 2004. (R. at 345-55.) Adcock presented to Dr. Kuhlman by referral from Dr. Myron Shank, M.D., Ph.D, for consultation regarding her chronic diffuse pain. (R. at 352-55.) Adcock reported her pain as a 10 on a 10-point scale, and she reported that her enjoyment of life, sleep, relationships with other people, ability to walk and work, her mood and her general activity were all completely interfered with due to her pain. (R. at 352.) She further reported problems with fibromyalgia and symptoms such as headaches, sleep disturbance, fatigue and TMJ dysfunction

-16-

syndrome. (R. at 352.) In addition, Adcock noted problems with her bowel function, intermittent numbness in the hands and feet and diffuse weakness. (R. at 352.)

Upon examination, Dr. Kuhlman found Adcock to be alert, oriented, pleasant and cooperative, but he explained that she demonstrated some chronic pain behaviors. (R. at 353.) Dr. Kuhlman indicated that Adcock was moderately obese, and her cervical range of motion and back range of motion were found to be slightly limited. (R. at 353.) Adcock's upper and lower limb range of motion were good, and a strength examination showed some "give way" weakness in the shoulders, hips and hands. (R. at 353-54.) No muscular atrophy was observed. (R. at 354.) Adcock's reflexes appeared to be fairly brisk throughout, and Dr. Kuhlman noted that she had a bilateral Hoffman sign, no ankle clonus and no Babinski sign or other long trac signs. (R. at 354.) A sensory examination showed a slight decrease in sensation in the median nerve distribution of both hands. (R. at 354.) A vascular examination revealed mild puffiness in her hands, which was noted as a chronic condition. (R. at 354.) In addition, Adcock had mild puffiness in her calves and feet. (R. at 354.) She had excellent pulses, good capillary refill and her hands and feet were warm to touch. (R. at 354.) No chronic venous stasis changes were noted in her distal calves. (R. at 354.) Adcock's cranial nerves were grossly intact, and a palpatory examination revealed 18 of 18 fibromyalgia tender points. (R. at 354.) Dr. Kuhlman noted that Adcock experienced pain all over her body upon palpation, explaining that the fibromyalgia areas were more tender than the other areas. (R. at 354.)

Dr. Kuhlman found that Adcock suffered from chronic pain syndrome, fibromyalgia, depression, probable bilateral carpal tunnel syndrome, possible mild

-17-

cervical myelopathy, lumbosacral degenerative joint and disc disease, but not lumbar radiculopathy and multiple endocrine problems with hypothyroidism, cystic ovarian disease and diabetes. (R. at 354.) Dr. Kuhlman opined that Adcock's then-current symptoms were due to the above-mentioned diagnoses, and he noted that she would likely continue to experience pain for the rest of her life. (R. at 354.) However, he recommended some simple treatment options that he felt would provide significant benefit to her, including further medical testing, instruction regarding a consistent exercise program to address her fibromyalgia, a prescription for Soma and he advised her to continue taking Tylenol #3. (R. at 354-55.)

A magnetic resonance imaging, ("MRI"), of the cervical spine without contrast was performed on October 12, 2004, and the impression indicated that there were poorly defined areas of increased signal on T2-weighted images in the pons in the cervical spine. (R. at 335-36.) It was noted that such areas could represent demyelinating process, and further evaluation by MRI of the brain was recommended to evaluate potential additional lesions on the brain. (R. at 335.) On October 13, 2004, Dr. Kuhlman's treatment notes included a review of the MRI, and he noted that Adcock's physical examination revealed a bilateral Hoffman sign, which supported the radiologist's recommendation that she undergo an MRI of the brain. (R. at 351.) The brain MRI was performed on October 21, 2004, revealing increased signal lesions in the corpus callosum, periventricular and in the subcortical white matter, which were consistent with demyelinating process such as multiple sclerosis. (R. at 331-32.) The MRI also showed mucosal thickening in the left maxillary sinus. (R. at 332.) In treatment notes dated October 26, 2004, Dr. Kuhlman reviewed the MRI findings and advised Adcock to see a neurologist. (R. at 350.)

Adcock presented to Dr. Kuhlman on November 5, 2004, for a follow-up appointment, at which time nerve conduction studies and an electromyogram, ("EMG"), were performed. (R. at 346-49.) Upon physical examination, Dr. Kuhlman noted that Adcock was "about the same." (R. at 346.) The nerve conduction studies and EMG revealed normal findings. (R. at 346-49.) The clinical impression noted probable demyelinating process such as multiple sclerosis, as well as a history of chronic pain syndrome, fibromyalgia, depression, lumbosacral degenerative joint and disc disease, hypothyroidism, cystic ovarian disease and diabetes. (R. at 347.) Dr. Kuhlman arranged an appointment at the Cleveland Clinic Neurology Department to obtain a definitive diagnosis, and he advised her to follow up with him in approximately one month. (R. at 347.) Adcock returned for her follow-up appointment on December 7, 2004, and it was noted that the physician from the Cleveland Clinic Foundation opined that she "probably did have multiple sclerosis," but he wanted to proceed with further testing. (R. at 345.) Upon physical examination, Dr. Kuhlman again reported that Adcock was "about the same." (R. at 345.) The diagnoses included probable multiple sclerosis, fibromyalgia, depression and hypothyroidism. (R. at 345.) Adcock was advised to follow up with the Cleveland Clinic, instructed to continue her medications and exercises and she was prescribed Nalfon. (R. at 345.)

Adcock presented to the Midwest Pain Treatment Center on August 3, 2004, with chief complaints of severe pain in her neck and shoulders bilaterally, mid and lower back pain and pain in her feet and hands. (R. at 310-11.) The clinical impression indicated that Adcock suffered from chronic pain secondary to fibromyalgia. (R. at 310.) She appeared to have multiple tender points not in her

-19-

muscles involving the trapezius and rhomboids, but the tenderness also was present in the lumbar paravertebrals and the upper and lower extremity flexors and extensors. (R. at 310.) It was noted that she also demonstrated some signs consistent with cervical nerve root irritation, which was occurring bilaterally at C5 and C6. (R. at 310.) A cervical MRI with contrast and a sleep study was recommended. (R. at 310.) Adcock was prescribed Duragesic and was advised to discontinue her Codeine and Vicodin and to follow up in six weeks. (R. at 310-11.)

Adcock then presented to the Blanchard Valley Sleep Disorders Center on August 14, 2004. (R. at 312-13.) Dr. David Mitchell Atwell, M.D., noted a clinical impression that included obstructive sleep apnea, fibromyalgia and parasomnias. (R. at 313.) Dr. Atwell recommended a sleep study to rule out obstructive sleep apnea and also recommended that Adcock address behavioral issues such as weight reduction and smoking cessation. (R. at 313.) The sleep study was performed on August 20, 2004, which revealed moderate obstructive sleep apnea, which was found to be worse in the supine position, but not during stage rapid eye movement, ("REM"), sleep. (R. at 317-18.) No significant oxygen desaturation or arrhythmias were noted, but there was evidence of sleep fragmentation with increased arousals. (R. at 318.) It was noted that such findings indicated that Adcock was at risk for cardiovascular sequelae and daytime sleepiness. (R. at 318.) The final impression again noted obstructive sleep apnea, fibromyalgia and parasomnias. (R. at 318.) Dr. Atwell recommended that Adcock participate in behavioral therapy to reduce her weight by 10 percent over the next six to 12-month period. (R. at 318.) He further advised Adcock to maintain consistent bed times to avoid sleep deprivation, positional therapy was discussed and she was encouraged to stop smoking. (R. at

318.)  Adcock also was encouraged to return to the sleep laboratory for a CPAP titration.  (R. at 318.)

The record contains a Mental Status Questionnaire from the Rehabilitation Services Commission dated August 18, 2004, which was completed by a doctor or licensed psychologist whose name is illegible on the document.  (R. at 314-16.) Adcock was described as an overweight female with fair hygiene, who presented with a depressed and anxious mood.  (R. at 314.)  It was noted that Adcock showed signs and symptoms of anxiety, namely restlessness and hyper-awareness.  (R. at 314.) Adcock was found to be oriented to time, person and place, and her cognitive function was reported as fair.  (R. at 314.)  Her insight, judgment and other behaviors were somewhat limited, and it was noted that she was passive and dependent at times.  (R. at 314.)  Adcock was diagnosed with major depression, but was found to be capable of managing any possible benefits she may receive.  (R. at 315.)  Additionally, it was determined that Adcock retained a fair ability to remember, understand and follow directions, maintain attention, socially interact, adapt and react to pressures, in work setting or elsewhere, involved in simple and routine or repetitive tasks.  (R. at 315.) Her ability to sustain concentration, persist at tasks and complete them in a timely fashion was found to be mildly limited.  (R. at 315.)

On August 22, 2004, a licensed social worker, Robin Brown, completed a Daily Activities Questionnaire for the Rehabilitation Services Commission.  (R. at 319-20.) Brown reported that Adcock was unable to sustain employment due to attitude problems and mood swings.  (R. at 319.)  Brown also reported that Adcock's allegations of poor medical health might prevent her ability to perform work activities

-21-

during a usual workday or workweek. (R. at 319.) Brown noted that Adcock had past legal difficulties related to drugs and alcohol. (R. at 319.) In addition, Brown indicated that Adcock reported problems in areas such as food preparation, household chores, personal hygiene, shopping, driving, banking and bill paying and hobbies. (R. at 320.) It was noted that Adcock's boyfriend assisted her in the above-mentioned activities. (R. at 320.) Brown further noted that Adcock missed some appointments due to health problems, but explained that she presented with borderline personality traits and that she had been compliant with her medication regimen. (R. at 320.)

On September 23, 2004, Roger O. Lewis, Ph.D., a state agency psychologist, completed a MRFC, in which he found Adcock to be moderately limited in her ability to carry out detailed instructions, maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to work in coordination with or proximity to others without being distracted by them and in her ability to respond appropriately to changes in the work setting. (R. at 380-82.) Lewis also found no evidence of limitation in Adcock's ability to understand and remember very short and simple instructions. (R. at 380.) Adcock was found to be not significantly limited in all other areas that were assessed. (R. at 380-81.) Lewis's findings were affirmed by Mel M. Zwissler, Ph.D., another state agency psychologist, on February 19, 2005. (R. at 382.)

Lewis also completed a PRTF on September 23, 2004. (R. at 383-95.) Lewis indicated that Adcock's major depression disorder was an affective disorder that did not precisely satisfy the diagnostic criteria. (R. at 383, 386.) It was determined that Adcock's activities of daily living were mildly limited, and Lewis found that she

-22-

suffered from moderate limitations in maintaining social functioning, concentration, persistence and pace. (R. at 393.) No episodes of decompensation were noted. (R. at 393.) Lewis also found that Adcock's credibility did not appear to be an issue, noting that she alleged mainly physical functional limitations. (R. at 395.) On February 19, 2005, Zwissler affirmed Lewis's findings. (R. at 383.)

Adcock presented to Dr. A.K. Bhaiji, M.D., on October 18, 2004, for a consultative physical examination. (R. at 322-28.) In summarizing Adcock's medical history, Dr. Bhaiji indicated that Adcock had been diagnosed with a pituitary tumor in her head, noting that it allegedly caused abnormal hormone deficiencies, dizziness and blurry vision. (R. at 322.) Adcock also reported medical problems and conditions such as short term memory loss, confusion, diabetes, possible multiple sclerosis, sleep apnea, swollen fingers and hands and fibromyalgia. (R. at 322.) Upon examination, Dr. Bhaiji observed puffiness and swelling in both of Adcock's ankles. (R. at 324.) Adcock was diagnosed with a history of pituitary tumor, diabetes, fibromyalgia, sleep apnea and swelling of the feet and hands. (R. at 324.) Dr. Bhaiji determined that Adcock would not have difficulty performing work-related physical activities such as sitting or standing, but explained that she may have difficulty walking, lifting, carrying and handling objects. (R. at 324.) It was further determined that Adcock experienced no difficulty with hearing or speaking; however, Dr. Bhaiji noted that she would likely have difficulty traveling, zipping zippers, counting coins and opening jars. (R. at 324.)

Manual muscle testing performed by Dr. Bhaiji indicated that Adcock had either fair or good movement bilaterally in the shoulder abductors, shoulder external

-23-

rotators, shoulder internal rotators, finger abductors, finger adductors, knee flexors and knee extensions. (R. at 325.) Adcock exhibited normal movement in all other areas. (R. at 325.) However, Adcock's ability to grasp, pinch, manipulate and her fine coordination skills were found to be bilaterally abnormal. (R. at 325.) Dr. Bhaiji determined that Adcock's cervical spine, dorsolumbar spine, left and right passive shoulder, elbow, hip, ankle and wrist range of motions were all normal. (R. at 326-28.) Her right and left active shoulder range of motion was reduced, as was her hands/fingers flexion range of motion in her metacarpophalangeal, ("MP"), proximal interphalangeal, ("PIP"), and distal interphalangeal, ("DIP"), joints and her knee flexion range of motion. (R. at 326-28.)

A Case Analysis Sheet was completed by Dr. Paul T. Heban, M.D., on November 12, 2004. (R. at 344.) Dr. Heban noted that, other than obesity, Adcock suffered from no severe impairments. (R. at 344.) He found no neurological deficit, noted that there was no medically determinable impairment to explain her abnormal swelling and explained that there was no previous history of arthritis in Adcock's file. (R. at 44.)

Adcock was treated at the Cleveland Clinic from November 29, 2004, to September 21, 2005. (R. at 356-78, 419-51.) On November 29, 2004, Adcock presented to Dr. Francois Bethoux, M.D, based on the referral of Dr. Kuhlman for a consultation regarding a possible diagnosis of multiple sclerosis. (R. at 366-78.) Adcock reported that she had experienced no neurologic symptoms until she was

-24-

struck by a vehicle in 1999.[7]  (R. at 366.)  She indicated that, since the accident, she had experienced diffuse severe pain, migraine headaches and tingling in her feet.  (R. at 366.)  Adcock reported symptoms of depression, sleep difficulties, rated her pain as a nine on a 10-point scale, short-term memory problems, urinary symptoms, bowel disturbance, balance problems and blurred vision.  (R. at 367.)  She denied any anxiety-related problems.  (R. at 367.)  A mental status examination revealed no deficits of cognition and her affect was somewhat flat.  (R. at 368.)  The remaining physical examination was normal for the most part; however, testing showed that there was bilateral Hoffman's sign.  (R. at 368.)  Dr. Bethoux's assessment included a primary encounter diagnosis of central nervous system demyelination and pain in limbs.  (R. at 369.)  Dr. Bethoux advised Adcock to return to Dr. Kuhlman for pain management, ordered further testing and noted that he would educate Adcock about the possible diagnosis of multiple sclerosis.  (R. at 369.)

Adcock returned to the Cleveland Clinic on December 9, 2004, and reported no changes in her symptoms since the previous visit.  (R. at 363-65.)  Brain and cervical spine MRIs taken since the first visit showed lesions suggestive of multiple sclerosis.  (R. at 363-64.)  Thus, Dr. Bethoux ordered a cerebrospinal fluid analysis and more blood testing.  (R. at 364.)  Dr. Bethoux noted a primary diagnosis of central nervous system demyelination, not otherwise specified.  (R. at 365.)

On January 7, 2005, Adcock was again treated at the Cleveland Clinic where she reported increased pain and paresthesias in the legs and feet.  (R. at 357-61.)  She

---

[7]Although Adcock indicated during this examination that the accident occurred in 1999, other places in the record show that the accident actually occurred in August 2000.  (R. at 279, 286.)

also reported that she had been evaluated by an ophthalmologist, who opined that she did not have optic neuritis. (R. at 357.) Adcock complained of hazy vision and was observed to have a depressed mood. (R. at 357.) Adcock's fine movements were found to be slow in both hands. (R. at 358.) Dr. Bethoux diagnosed Adcock with multiple sclerosis, a skin sensation disturbance, malaise and fatigue. (R. at 358.) She was treated with intravenous steroids and was further educated as to multiple sclerosis and the treatment options available. (R. at 358.) Dr. Bethoux noted that this diagnosis would likely increase her anxiety, thus, he stated that, if necessary, he would refer her to health psychology. (R. at 358.)

Adcock continued treatment at the Cleveland Clinic from January 2005 through September 21, 2005. (R. at 424-51.) During these visits, she reported pain throughout her body, particularly in her back, neck, feet, legs and arms, as well as fatigue, sleep difficulties, stress, financial concerns, persistent diarrhea, urinary symptoms, dizziness, hot flashes, hazy vision, pain around her eyes, hand and arm numbness, tingling in her feet, and spasms in her back and legs. (R. at 424-51.) In addition to her continued diagnosis of multiple sclerosis, Dr. Bethoux noted that Adcock had weak hand intrinsics bilaterally, suffered from painful altered sensations and experienced difficulty sleeping. (R. at 424-51.) During these visits, Adcock rated her pain as a nine on a 10-point scale on more than one occasion. (R. at 424, 427.) Also, during the course of these visits, Adcock was prescribed Rebif, which was used to treat her multiple sclerosis. (R. at 424-51.)

The record contains a medical report dated February 1, 2005, from Dr. Myron Shank, M.D., which indicated that Adcock had been treated for thyroid problems. (R.

-26-

at 379.) It was noted that, at that time, Adcock's primary problem was multiple sclerosis. (R. at 379.) However, Dr. Shank explained the medical records referencing her multiple sclerosis were from the Cleveland Clinic Foundation; thus, Dr. Shank indicated that he possessed no information upon which to make a disability determination. (R. at 379.)

On March 7, 2005, Dr. Augusto Pangalangan, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), in which he found that Adcock could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, sit, stand and/or walk for a total of approximately six hours in a typical eight-hour workday and that she was unlimited in her ability to push and/or pull. (R. at 396-403.) Dr. Pangalangan also found that Adcock could occasionally climb, balance, stoop, kneel, crouch and crawl. (R. at 398.) No manipulative, visual, communicative or environmental limitations were noted. (R. at 399-400.)

Adcock presented to the University of Virginia Health System for treatment from December 12, 2006, to December 19, 2006. (R. at 460-65.) Adcock reported problems such as migraine headaches, restless legs, insomnia, swollen legs, hip pain, cognitive complaints, nocturia, chronic diarrhea and chronic daily headaches. (R. at 460.) A review of systems noted shortness of breath, cough, choking spells, bloody stools, frequent urination, fatigue, sweats, muscle tenderness, unusual thirst and depression. (R. at 460-61.) Upon examination, Adcock reported hip pain to palpation around the hip joint, as well as a passive range of motion with external rotation and flexion. (R. at 462.) The clinical impression indicated that Adcock appeared to be

-27-

stable on Rebif monotherapy, and it stated that many of the problems experienced by Adcock were likely unrelated to her diagnosis of multiple sclerosis. (R. at 463.) Adcock was instructed to restart Rebif, and MRIs of the brain and cervical spine were ordered to assess disease activity and the need for further therapy. (R. at 463.) She was prescribed Topamax, Prednisone and instructed to continue Cymbalta. (R. at 463.) Further blood testing was ordered, as was an x-ray of the hip. (R. at 463.)

Adcock was treated at Memorial Hospital of Martinsville and Henry County on December 26, 2006, for a left ankle injury. (R. at 453-58.) She indicated that she could not put any weight on the ankle and described the pain as severe. (R. at 453.) X-rays of the left ankle revealed no damage. (R. at 455.) Adcock was diagnosed with a left ankle sprain, the ankle was wrapped and she was prescribed Ultram, as well as crutches. (R. at 454.)

Adcock presented to Piedmont Community Services for treatment on January 11, 2007, and January 25, 2007. (R. at 476-81.) On January 11, 2007, Adcock presented for an intake interview and her eye contact, judgment, concentration, affect and speech were found to be normal, and her mood was calm. (R. at 478.) Transitions and family conflict were identified as stressors, and it was noted that there was no danger of risk factors. (R. at 478.) Adcock explained that she was stressed because she did not have her medication and because she recently left her husband, who she said was a crack addict. (R. at 478.) She further reported that she felt depressed most of the time and stated that without proper medication she worried that she would begin to drink again. (R. at 478.) A mental status examination indicated symptoms of anxiousness and depression. (R. at 481.) Adcock's judgment and

insight were reported as good, and it was noted that she was clearly able to identify her immediate and projected stressors, as well as her medical history. (R. at 481.) Adcock was interviewed by phone by a representative at Piedmont Community Services on January 25, 2007, and her concentration, judgment and speech was normal. (R. at 476.) She exhibited an anxious mood, her stressors were identified as transitions and the report indicated that there was no danger of risk factors. (R. at 476.)

## III. Analysis

The Commissioner uses a five-step process in evaluating SSI and DIB claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2009). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2009).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the

claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2008); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated February 5, 2007, the ALJ denied Adcock's claims. (R. at 19-31.) The ALJ found that Adcock met the insured status requirements of the Act for DIB purposes through September 30, 2007. (R. at 21.) The ALJ also found that Adcock had not engaged in substantial gainful activity since June 30, 2004, the alleged onset date of disability. (R. at 21.) The ALJ determined that the medical evidence established that Adcock suffered from severe impairments, namely multiple sclerosis, fibromyalgia, obstructive sleep apnea and a mental disorder. (R. at 23-24.) However, he found that Adcock did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 25.) After consideration of the medical evidence, the ALJ determined that Adcock retained the residual functional capacity to perform a wide range of work at the sedentary level of exertion, noting that although Adcock would be required to work in a low stress environment, she nonetheless had the mental capacity and adequate attention/concentration to understand and carry out routine work tasks, to relate to others on an intermittent basis and to adapt to infrequent changes in schedules and routines. (R. at 26.) In addition, the ALJ found that Adcock could frequently lift and/or carry items weighing up to 10 pounds, stand/walk for at least two hours in an eight-hour workday and sit for approximately six hours in an eight-hour workday. (R. at 26.) The ALJ determined

-30-

that Adcock could occasionally climb, balance, stoop, kneel, crouch and crawl, noting no other significant manipulative, visual, communicative or environmental limitations. (R. at 26.) Based upon these findings, the ALJ found that Adcock was unable to perform any of her past relevant work. (R. at 29.) Transferability of job skills was found to be non-material to the determination of disability because, according to the ALJ, using the Medical-Vocational Rules as a framework supported a finding of "not disabled" whether or not the Adcock possessed transferable skills. (R. at 29.) Based upon Adcock's age, education, work experience, residual functional capacity and the testimony of a vocational expert, the ALJ determined that there were jobs existing in significant numbers in the national economy that she could perform, including occupations such as a cashier, a receptionist and a general clerk. (R. at 30.) Thus, the ALJ concluded that Adcock was not under a disability as defined in the Act and was not entitled to benefits. (R. at 25.)

Adcock argues that the ALJ's decision is unsupported by substantial evidence of record. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 12-19.) Adcock first argues that the ALJ failed to properly consider her manipulative limitations, as noted in the findings of the consultative examination, and, as a result, the ALJ's residual functional capacity finding, as well as his finding that there are jobs in the national economy that she can perform, are unsupported by substantial evidence of record. (Plaintiff's Brief at 14.) Additionally, Adcock claims that the ALJ erred by failing to sustain his burden of establishing that there is other work within the national economy that she could perform, as he relied on testimony from the vocational expert that was in response to an improper hypothetical question, and because the vocational expert's testimony was inconsistent

Case 2:09-cv-00003-GMW-PMS   Document 14   Filed 10/14/09   Page 31 of 37   Pageid#: 93

with the Dictionary of Occupational Titles.  (Plaintiff's Brief at 14-19.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings.  The court must not weigh the evidence, as this court lacks the authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence.  *See Hays*, 907 F.2d at 1456.  In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence.  *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein.  *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

 Adcock first argues that the ALJ failed to include manipulative limitations in his residual functional capacity finding, contending that the medical evidence shows that she suffers from bilateral hand and arm problems that would adversely affect her

-32-

ability to perform sedentary work. (Plaintiff's Brief at 12-14.) After reviewing the relevant medical evidence of record, I agree.

The ALJ determined that Adcock retained the residual functional capacity to perform a wide range of sedentary work. (R. at 26.) The ALJ outlined certain limitations in his residual functional capacity finding, specifically noting that, among other things, Adcock had no significant manipulative limitations. (R. at 26.) The court notes that Adcock alleged disability due, in part, to limb numbness and swelling of her fingers, conditions which would certainly impact one's fine manipulation abilities. (R. at 124, 170.) She also consistently reported subjective complaints such as intermittent numbness in the hands and arms, diffuse weakness, as well as pain and swelling in the hands and fingers. (R. at 310-11, 322, 352, 424-51.) In addition, one of Adcock's treating physicians, Dr. Kuhlman, indicated that Adcock suffered from "give way" weakness in the hands, a slight decrease in sensation in the median nerve distribution of each hand and a chronic condition of puffiness in her hands. (R. at 353-54.) Dr. Kuhlman diagnosed Adcock with probable bilateral carpal tunnel syndrome. (R. at 354.) Dr. Bhaiji, who conducted a consultative examination, found that Adcock would possibly experience difficulty lifting, carrying and handling objects. (R. at 324.) Notably, Dr. Bhaiji also determined that Adcock would likely have difficulty zipping zippers, counting coins and opening jars. (R. at 324.) Dr. Bhaiji concluded that Adcock's ability to grasp, pinch and manipulate, as well as her fine coordination skills, were all bilaterally abnormal. (R. at 325.) He also noted that Adcock's hand/fingers flexion range of motion in her MP, PIP and DIP joints was reduced. (R. at 326-28.) Furthermore, Dr. Bethoux, another treating physician, consistently noted that Adcock had weak hand intrinsics bilaterally, (R. at 424-51),

-33-

and he found that her fine movements were slow in both hands. (R. at 358.)

As mentioned above, in rendering his residual functional capacity finding, the ALJ determined that Adcock suffered from no significant manipulative limitations. (R. at 26.) In support of this finding, the ALJ explained that he gave no significant weight to the findings of Dr. Bhaiji, stating that Dr. Bhaiji only examined Adcock on one occasion and failed to specify the degree of limitation in any area of functioning. (R. at 28.) The ALJ indicated that, for the most part, he concurred with the state agency opinions, including the opinion of Dr. Pangalangan, who, without examining Adcock and simply reviewing medical evidence, found that Adcock had no manipulative limitations. (R. at 28-29, 399-400.) Based upon the testimony of a vocational expert, the ALJ eventually determined that Adcock was able to perform certain unskilled sedentary occupations, such as a cashier, a receptionist and a general clerk. (R. at 30.)

According to Social Security Ruling 96-9p, "[m]ost unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g. to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions." *See* S.S.R. 96-9p, (July 2, 1996). Furthermore, "[a]ny *significant* manipulative limitation of an individual's ability to handle and work with small objects with both hands will result in a significant erosion of the unskilled sedentary occupational base." *See* S.S.R. 96-9p, (July 2, 1996). In this case, the medical evidence of record shows that more than one treating source, as well as a consultative examiner, found that Adcock suffered from manipulative limitations that could reduce

-34-

and negatively impact her ability to work with her hands and fingers. Nevertheless, the ALJ concluded that Adcock could perform certain unskilled sedentary jobs, despite the fact that the Social Security Administration has plainly stated that such occupational base would be significantly reduced if an individual possessed significant manipulative limitations. *See* S.S.R. 96-9p, (July 2, 1996).

The court recognizes that state agency physician Dr. Pangalangan's opinion supports the ALJ's determination that Adcock had no manipulative limitations. (R. at 399-400.) The court also recognizes that, in the ALJ's detailed residual functional capacity finding, he did not specifically limit Adcock to only unskilled sedentary work; instead, the ALJ stated that she could perform a "wide range of work at the sedentary level of exertion." (R. at 26.) Nonetheless, when identifying specific jobs that Adcock could perform, the ALJ named only unskilled sedentary occupations. (R. at 30.) Despite the state agency physician's opinion, when considering all evidence of record, the undersigned is of the opinion that, based upon the findings of more than one treating physician and the findings of a consultative examiner, as well as the subjective complaints of the claimant, substantial evidence shows that Adcock does indeed suffer from certain manipulative limitations.

The court does not suggest that the inclusion of such limitations would have rendered Adcock disabled. In fact, the court notes that Social Security Ruling 96-9p states that only "significant" manipulative limitations will cause a significant erosion of the unskilled sedentary occupational base. The court is aware that the ALJ found that Adcock suffered from no "significant" manipulative limitations, which may have meant that she suffered from certain manipulative limitations that did not rise to the

-35-

level of a significant impairment. However, it is the court's opinion that substantial evidence indicates that the ALJ should have included manipulative limitations in his residual functional capacity finding. Although evidence from multiple sources demonstrated that Adcock suffered from certain manipulative limitations that would impact her ability to perform unskilled sedentary jobs, the ALJ simply dismissed those findings and summarily concluded that there were no significant manipulative limitations. Had the ALJ properly included such limitations, the vocational expert's testimony may have been different, further reducing or possibly eliminating the remaining job base. As such, the court finds that substantial evidence does not support the ALJ's determination that Adcock suffered from no significant manipulative limitations. The court will not address the remaining issues raised by Adcock because, as argued by Adcock, the ALJ's error with regard to her manipulative limitations clearly impacted the testimony given by the vocational expert. Thus, for the above-stated reasons, this case shall be remanded to the Commissioner for further consideration of Adcock's physical limitations.

## IV. Conclusion

For the foregoing reasons, Adcock's motion for summary judgment will be denied, the Commissioner's motion for summary judgment will be denied, the Commissioner's decision denying benefits will be vacated and the case will be remanded to the Commissioner for further consideration consistent with this Memorandum Opinion.

An appropriate order will be entered.

-36-

DATED:     This 14th day of October 2009.


                              /s/   *Glen M. Williams*
                              SENIOR  UNITED  STATES  DISTRICT  JUDGE